The SAVINGS & LOAN ASSOCIATION
OF BANGOR

v.

Thomas W. TEAR and Mary Tear.

Supreme Judicial Court of Maine.

Argued Sept. 14, 1981.

Decided Oct. 16, 1981.

Stearns, Finnegan & Needham, John A. Woodcock, Jr., (orally), Bangor, for plaintiff.

Silsby & Silsby, Sandra Hylander Collier (orally), Ellsworth, for defendant.

Before McKUSICK, C. J., and GODFREY, NICHOLS, ROBERTS, CARTER, VIOLETTE, and WATHEN, JJ.

McKUSICK, Chief Justice.

Pursuant to 14 M.R.S.A. §§ 6203–F, 6321–6325 (1980), The Savings & Loan Association of Bangor (hereafter S & L) brought this action in Superior Court, Penobscot County, to foreclose the rights of defendants Thomas and Mary Tear in a contract for the sale by S & L of real estate to them. The Superior Court found that defendant purchasers were in breach of the purchase and sale agreement by reason of failing both to make timely payment and to keep the premises insured. Defendants, appealing from the judgment of foreclosure, argue that the Superior Court's findings were clearly erroneous. We agree and accordingly reverse the judgment below.

### Facts

Late in 1978 Thomas and Mary Tear arranged to buy a house in Bangor from S & L. They moved into the house in January of 1979 and signed a purchase and sale agreement in February after making preliminary repairs in lieu of a down payment. The purchase and sale agreement provided for a sale price of $33,000 to be paid, with interest at 11 percent per annum on the unpaid balance, in monthly amounts of $317.27, due the first of each month. Failure to pay the monthly amount for 30 days after the due date would activate S & L's foreclosure rights. In addition, the Tears were to maintain insurance on the property in the amount of at least the purchase price.

The Tears never made their monthly payments on time. Two of their checks were returned for insufficient funds; on two other occasions they paid after the 30-day grace period had expired. On those occasions S & L accepted the late payments. The last payment about which the parties agree was that due on July 1. It was paid and accepted on August 8. The payment due August 1 was not paid during the 30-day grace period. On September 5 Mr. Tear tendered a money order for $317 and

cash of 27¢.[1] A teller of S & L took the money order and stamped the following endorsement on the reverse:

FOR DEPOSIT ONLY IN 52-33

The Savings & Loan Ass'n of Bangor

Later that day, S & L returned the money order so stamped to Mr. Tear by certified mail, along with a letter informing him that the agreement was broken as of September 1 and that S & L was going to evict him. Mr. Tear's subsequent monthly tenders were rejected.

At the outset of the agreement Mr. Tear got an insurance policy from agent John Russell. The policy was written by Aetna Casualty and Surety Company, and agent Russell testified that it was a "direct bill" policy, meaning that the bills would be sent by Aetna to Tear directly, not through Russell. Tear made an initial premium payment to Russell, but testified that he subsequently got no bills and made no further payments. Russell received a notice of cancellation from Aetna bearing the effective date of June 10, 1979. Russell testified that in the ordinary course of business he would have received this notice 10 to 15 days *after* the effective date and that what he received was a copy of a notice that Tear should have received. Both Tear and an officer of S & L testified that neither received notice of cancellation until sometime in September. At that time both, acting independently, made other arrangements for insurance.

### Sufficiency of the Evidence

The Superior Court found that the Tears were in breach both for late payment and for failing to maintain insurance. This record does not contain evidence sufficient to support a finding of either breach.

A mortgagee waives its right to foreclose if it accepts tender of a late payment. *Winchester v. Ball*, 54 Me. 558 (1867). However, S & L argues that it did not "accept" Mr. Tear's September 5 payment: although it took the personal money order from Tear, it did not intend to apply the payment to Tear's account. That proposition cannot be maintained on the facts of this case. Mr. Preble, vice president of S & L, testified that he had told the head teller not to accept further payments on the Tear account because it was in litigation, but this instruction evidently did not reach Teller 4, who stamped the check, or if it did it was ignored. The teller who took the check was S & L's agent and S & L was bound by its agent's action. Even if Mr. Preble had communicated his instruction to the teller, the teller had apparent authority to bind S & L in accepting the payment. *See Restatement (Second) of Agency* § 27, Comments a, d. The only evidence in the record as to why the teller took Tear's payment leads to the conclusion that it was accepted as payment on the purchase and sale agreement. Tear testified that that was why he gave S & L the check. The loan account number was written on the face of the check. There had been a prior course of dealing in which Tear tendered late payments on the account and they were accepted as such.[2] There is no evidence in the record that the instrument was offered or received for any other obligation, to procure services, or as a gift. Whoever Teller 4 was and whatever may in fact have been going through that teller's mind, the facts in the record are objectively indicative of intent by S & L through its agent to accept the instrument as what it purported to be, the Tears' monthly payment on the purchase and sale agreement. Any other finding on this evidence would be clearly erroneous. S & L's argument that it never accepted

1. The form in which the 27¢ was tendered, and its subsequent history, are not entirely clear. Trial counsel did not think the matter of any significance.

2. Other jurisdictions have adopted the rule that, where a payee under a contract consistently accepts late payments, it is estopped from claiming lateness as a breach unless it gives the payor advance warning. *Margolin v. Franklin*, 132 Ill.App.2d 527, 270 N.E.2d 140 (1971); *Harrison v. Puga*, 4 Wash.App. 52, 480 P.2d 247 (1971). No such notice is in evidence in this case, but since we find that S & L accepted Tear's payment, it is unnecessary for us to consider the applicability of this doctrine in Maine.

Tear's money is particularly bold in view of the fact that S & L never gave it back to him in the same form. S & L returned to him a restrictively indorsed instrument that had become to Tear a worthless piece of paper.[3] Indorsed as it was, the money order could not be returned to the drawee bank for a refund.

S & L never presented Tear's instrument for payment, but that fact hardly advances S & L's position. The Uniform Commercial Code provides that where a demand instrument is taken for an underlying obligation, the obligation is suspended until the instrument is presented. 11 M.R.S.A. § 3–802 (1964). The only condition that remains to be fulfilled for discharge of the obligation is the honoring of the instrument when presented. *Id.* Thus, S & L's action through its teller in taking Tear's check was, for the purposes of this case, the functional equivalent of a conditional acceptance of the check in discharge of the obligation, the sole condition being the subsequent honoring of the check, not its presentment. Only subsequent dishonor of the accepted instrument, not S & L's unilateral decision not to present it, would vitiate S & L's waiver of the late-payment breach.

The Superior Court also found that the Tears had permitted their property insurance to lapse and thus were in breach of their covenant to keep the premises insured. There was evidence from which the court could have found that the Tears received notice of the policy's cancellation. Agent Russell testified that Aetna sent him a copy of a notice that in the ordinary course of business would have been sent to the Tears. Mr. Tear testified that he never received that notice,[4] but the court might not have believed that testimony. Since credibility

and weight of testimony are for the trier of fact, *Qualey v. Fulton*, Me., 422 A.2d 773 (1980), a finding by the trial judge that the Tears did receive notice of the cancellation sometime in June of 1979 is not clearly erroneous.

However, under the Maine Property Insurance Cancellation Control Act, 24–A M.R.S.A. §§ 3048–3056 (1974 & Supp.1980), notice of cancellation must meet strict requirements, and the evidence shows that those requirements were not met by the notice sent in this case. It is true that the act was never mentioned in the trial court, and S & L contends that the Tears have therefore waived its applicability. However, the factual issue of whether the Tears received notice was fully raised at trial, and evidence as to the only notice given by Aetna was produced. A principal reason for the rule that an issue may not be asserted for the first time on appeal is that raising the issue at trial is likely to stimulate the making of an evidentiary record and findings of fact necessary to resolve it. *Harrington v. Inhabitants of Town of Garland*, Me., 381 A.2d 639, 643 (1978); *Reville v. Reville*, Me., 289 A.2d 695, 697 (1972). The notice issue was sufficiently raised at trial to produce the necessary evidence, and therefore the question of compliance with the Insurance Cancellation Act may be here addressed.

Under 24–A M.R.S.A. § 3050, for insurance cancellation for nonpayment of premium to be effective, notice must be received by the insured at least 10 days prior to the effective date of cancellation and the notice must inform the insured of his right to apply for a hearing before the superintendent of insurance.[5] The right to

---

**3.** S & L maintains that the instrument was restrictively indorsed as a matter of standard practice demanded by S & L's bonding company and by its auditors to render all instruments nonnegotiable and hence reduce loss in case of bank robbery. S & L argues that the restrictive indorsement is therefore not evidence of acceptance. But the internal requirements of S & L's auditors and bonding company are irrelevant. They may explain why the instrument

was indorsed as it was, but not why S & L took it in the first place.

**4.** The Tears' argument from the fact that S & L, also a named insured on the face of the policy, also did not receive notice proves nothing, since it is clear from Russell's testimony that if there was a separate copy for S & L, it too would have gone to the Tears' address.

**5.** 24–A M.R.S.A. § 3050 (Supp.1980) provides in pertinent part:

apply to the superintendent of insurance is nowhere mentioned on the notice received by Russell, which he testified was a copy of the notice the Tears would have received. Russell further testified that he would have received his copy 10 to 15 days after the effective date of cancellation. On this evidence the cancellation was ineffective. Since the policy was to run until March 29, 1980, it was still in force at the time S & L brought its foreclosure action, and the Tears were not in breach of the purchase and sale agreement because of any failure to keep the premises insured.

The entry is:

Appeal sustained.

Case remanded to the Superior Court for entry of judgment for defendants.

All concurring.

No notice of cancellation of a policy shall be effective unless received by the named insured at least 20 days prior to the effective date of cancellation, or, where the cancellation is for nonpayment of premium, at least 10 days prior to the date of cancellation. . . .

Except for a policy which has been in effect for less than 60 days at the time notice of cancellation is received by the named insured, the reason for cancellation shall accompany the notice, together with a notice of the right to apply for a hearing before the Superintendent of Insurance within 30 days, as provided in section 3054.